**Manuel BATISTA, Plaintiff,**

v.

**Shirley S. CHATER[1], Commissioner of Social Security, Defendant.**

**No. 96 Civ. 3885 (SS).**

United States District Court, S.D. New York.

July 29, 1997.

---

1. Presently, the Acting Commissioner of Social Security is John J. Callahan.

Charles E. Binder, Binder and Binder, Hauppauge, NY, for Plaintiff.

U.S. Atty. for the S.D. New York, Linda Riffkin, Sapna V. Raj, Asst. U.S. Attorneys, New York City, for Defendant.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiff Manuel Batista brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to challenge a final determination of the Commissioner of Social Security ("the Commissioner"), denying plaintiff's application for disability insurance benefits and Supplemental Security Income ("SSI") based on disability. Pursuant to Fed.R.Civ.P. 12(c), both parties have moved for judgment on the pleadings. For the reasons to be discussed, both motions for judgment on the pleadings are **DENIED.** Plaintiff's action is **REMANDED** to the Commissioner for reconsideration consistent with this Opinion and Order.

## FACTUAL BACKGROUND

Plaintiff filed applications for Social Security disability insurance and Supplemental Security Income ("SSI") on October 19, 1992, alleging an onset of disability of September 6, 1989. (Tr. 84–87.)[2] Plaintiff met the special insured status earnings requirements of the Social Security Act ("the Act") for establishing eligibility to disability insurance benefits on the alleged onset date of his disability. (Tr. 119.) The Commissioner found the plaintiff to have continued to meet the insured status through December 31, 1994. (*See* Defendant's Memorandum at 3.) Insured status is not a consideration for SSI eligibility. The October 19, 1992 application was denied on November 30, 1992. (Tr. 101.) Plaintiff subsequently requested reconsideration on December 3, 1992, which was denied on January 19, 1993. (Tr. 111–114.)[3] After the denial of his reconsideration application, plaintiff requested an administrative hearing on January 25, 1993. (Tr. 115–118.) The Administrative Law Judge issued a Notice of Dismissal on November 8, 1993[4], but the

---

2. "Tr." refers to pages of the transcript of the administrative record filed by the Commissioner as part of her answer to plaintiff's complaint.

   Plaintiff filed an initial application for disability insurance benefits on November 22, 1991 (Tr. 62–65.), but the record does not reveal that he pursued further action after this application was denied at the reconsideration level. (*See* Tr. 66–69, 71, 80–83.)

3. The date on the Notice of Reconsideration Determination is illegible; however, the Exhibits List on page two of the Transcript indicates the reconsideration denial was issued on January 19, 1993.

4. Plaintiff alleged that he never received notice of his hearing date, and therefore, never appeared. (*See* Tr. 288–98.) He did not have the opportunity to respond timely to the Notice To Show Cause for Failure to Appear because the

application was remanded for a hearing by Order of the Appeals Council on December 20, 1993.

On March 2, 1995, a hearing was held before ALJ Robin J. Arzt. (Tr. 24–61.) The plaintiff, who is illiterate and unable to communicate in English, appeared *pro se* and testified through a Spanish interpreter. (Tr. 13.)

At the time of his March 2, 1995 hearing, plaintiff was forty-six years old with a first grade education. (Tr. 35, 84.) He had worked in a rug factory as a packer for seventeen years. (Tr. 36.) Plaintiff testified that his work involved lifting packages of up to 200 pounds, with assistance of others when necessary. Plaintiff stood, bent and walked during most of his work day. (Tr. 36–37.) Plaintiff further testified that his employer warned him several times that he would be terminated because of his excessive lateness and absentee rate, which plaintiff claims were due to his illnesses. Plaintiff, however, left his employment on his own accord in September of 1989. (Tr. 37.) He has not worked since that time. (*Id.*)

The record shows that plaintiff has been diagnosed with a combination of physical and psychiatric impairments, including hypertension, arthritis of the back and neck, right shoulder problems, angina pectoris, Peptic Ulcer Disease (PUD), gastritis, duodenitis, hypopotassemia and dysthymic disorder with depression anxiety. (*See* Ex. 29–34, 44–64.) Eduardo Pignaelli, M.D., plaintiff's treating physician who first examined him on December 10, 1993, submitted a Medical Report dated November 14, 1994, in which he diagnosed plaintiff with hypertension and depression. Dr. Pignaelli reported that plaintiff's hypertension was controlled with medication. The doctor restricted plaintiff from heavy lifting, but opined that his ability to stand, walk, lift, carry and sit were not affected. (Tr. 345–350.) Plaintiff also notified the Social Security Administration that he had other treating doctors, Pedro L. Benedicto and Dr. Caplan (Tr. 123–131.), who had both been treating him during his alleged disability

Office of Hearing and Appeals was allegedly never notified of his change of address. (*See* Tr.

date of September 6, 1989, but the record does not contain any reports or documentation from these doctors.

Gerald Galst, M.D., the Social Security medical expert with expertise in cardiology (Tr. 370), testified at the hearing that plaintiff does not fully understand the nature of his impairments. For example, Dr. Galst explained that plaintiff was confused about his kidney problem (Tr. 50.), and that although plaintiff complained to Wei Kao, M.D., the consultative expert, that plaintiff had a heart attack, all of his objective medical evidence regarding his heart are normal and showed no cardiac damage. (Tr. 51.) Dr. Galst also testified that plaintiff's blood pressure was well controlled on medication, but that he was taking Pamelor for his psychiatric problems, which Dr. Galst considered to be plaintiff's major illness. (Tr. 58.) Dr. Galst pointed out to the ALJ that Dr. Ariet Casals, plaintiff's psychiatrist, was treating him with psychotherapy for depression. Dr. Galst also said that Dr. Casals' opinion indicated that plaintiff had a dysthymic disorder with depression and anxiety, hypertension, angina and diabetes mellitus. (Tr. 57.) Further, Dr. Galst observed that plaintiff was depressed and suffered from severe anxiety. Although Dr. Galst conceded that he was not a psychiatrist, he concluded that based on plaintiff's testimony and Dr. Casals' report, plaintiff was not able to work due to his psychiatric impairments. During Dr. Galst's testimony, the Spanish interpreter advised the ALJ that he had trouble translating the medical terms in Dr. Galst's testimony. (Tr. 51–52.)

The record is not clear on the onset date of plaintiff's psychiatric condition. The record does not contain any medical records regarding plaintiff's psychiatric impairment during plaintiff's alleged disability onset date of September 6, 1989. Although plaintiff testified that his psychiatric problems began when his son died in 1993, the record reveals evidence that his psychiatric problems might have started before 1993. For example, there is an indication that plaintiff is a "very anxious

288–298.)

person" in his medical records from Bronx–Lebanon for Period 4–15–91 to 11–4–91 in Exhibit 29. (Tr. 165.) Plaintiff was observed to be "tearful and holding his head" but "remains alert and oriented to person, place and time" during an "urgent" visit for severe head pain to Lincoln Medical and Mental Health Center Emergency Services on November 11, 1991. (Tr. 400.) Also, the record reveals a document dated 12/04/92 that states that plaintiff "has an element of hypochondria/paranoia", and that he was to be scheduled for a psychiatric consultation. (Tr. 245.) The record, however, does not include the results of this consultation. Other documentation regarding plaintiff's psychiatric impairment include the Questionnaire as to Psychiatric Impairment and the Medical Assessment of Ability to Do Work–Related Activities (Mental) by Ariet Casals, M.D., dated October 12, 1994 (Tr. 339–342.), and a letter from E. Hernandez, CSW, of the Bronx–Lebanon Hospital Center Department of Psychiatry Crotona Park Community Mental Health Center, dated February 28, 1995, verifying that plaintiff is attending the Adult Outpatient Clinic and receiving psychotherapy at Bronx–Lebanon. (Tr. 369.) In Dr. Casals' Questionnaire, there is a brief, three-sentence summary of the results of plaintiff's mental status examination, the only report of any objective tests in the record, which indicates that plaintiff is "alert and fully oriented. His mood is anxious, and depressed. He is of average intelligence. He has exhibited mild memory problems, problems of immediate recall." (Tr. 339.) The actual results of the mental status examination are not in the record.

In a decision dated October 20, 1995, the ALJ found that the plaintiff was not disabled under Titles II and XVI of the Act. (Tr. 10–20.) The ALJ found that plaintiff had arthritis of his cervical and thoracic spine, hypertension and dysthymic disorder. The ALJ included that the medical evidence of record verified that plaintiff "retains the functional capacity for low stress light work activity which does not require remembering and carrying out complex instructions." (Tr. 14.) In reaching her decision, the ALJ considered plaintiff's arthritis, back pain and hypertension. The ALJ discussed the report dated May 12, 1994, of Dr. Wei Kao, which stated that plaintiff's hypertension is well-controlled with medication and that his osteoarthritis is mild. (Tr. 15.) The ALJ failed to discuss, however, that Dr. Kao observed that plaintiff appeared to be agitated and recommended a psychiatric exam for plaintiff. (Tr. 323.)

In her decision, the ALJ also reviewed Dr. Galst's testimony indicating that plaintiff's hypertension was well controlled and that plaintiff had mild degenerative joint disease of the spine and minimal degenerative joint disease of the thoracic spine. (Tr. 16.) The ALJ then stated: "Dr. Galst concludes that the claimant should be able to do light to medium work activity." (*Id.*) What Dr. Galst actually said, was: "[B]ased on his testimony here and the report of Dr. Casals, I don't think he's capable of doing any work at this time. And I would be inclined to think he had a residual functional capacity which is less than sedentary though he does not meet any specific listings." (Tr. 58.) Dr. Galst stated that plaintiff had a residual functional capacity of light to medium only after the ALJ asked him to give an assessment of plaintiff's residual functional capacity prior to the onset of his psychiatric problem.[5]

---

5. The hearing proceeded as follows:

Q What—you're basically saying that his problem is psychiatric and that's what's putting him at a less than sedentary rather than his physical problem.
A Correct
Q Okay. You made a comment just now that you're—based on your observations, and I know you're not a psychiatrist, however, I would ask you if you would mind indicating to me what observations you've made during the course of this hearing that made you say that?
A I observed Mr. Batista's mood and affect which is certainly sad and probably depressed.

The large variety of problems which I think are probably psychogenic and the numerous somatic complaints and disturbances that he speaks of for which there's relatively little documentation would suggest that this is a problem with anxiety.
Q Uh-huh.
A The observations that I've made here are he's been tearful throughout the hearing. He is sitting there and continually wringing his hands and twisting his hat. I don't think he's aware of this right now. This is a problem. This is consistent with the report of Dr. Casals the psychiatrist. I might also mention, as I believe I did, that he is on Pamelor, which is

In her decision, the ALJ also considered Dr. Casals' Questionnaire. The ALJ understood Dr. Casals to indicate that plaintiff has a good ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, and function independently, a fair ability to deal with work stresses and maintain attention and concentration, a good ability to understand, remember and carry out simple or complex job instructions, an unlimited ability to maintain personal appearance, and a good ability to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (Tr. 18, 339–342.) The ALJ, however, did not mention that Dr. Casals also wrote: "Patient[']s impairment of immediate recall and loss of energy may affect his ability to carry out instructions" and "Patient is often tearful. Under stress he becomes more acutely nervous and unable to focus." (Tr. 340.) Further, Dr. Casals indicated that plaintiff's impairment lasted or can be expected to last at least twelve months, and that "patient[']s progress has been slow and he is under great stress due to severe losses. He will continue to need psychiatric services to maintain present level of functioning and prevent return of more severe symptoms." (Tr. 342.)

The ALJ also stated in her decision that plaintiff does housework, uses public transportation, and visits people. (Tr. 16.) In March 1992, Dr. M. Mescon, a consultative examiner, reported that plaintiff was able to clean and cook and was able to carry two gallons of milk easily. (Tr. 225.) The record reflects, however, that plaintiff had significant difficulties with common life tasks.

Plaintiff stated, for instance, that "I am not able to use the bus as 'it makes me dizzy. I use the subway but suffer shortness of breath when climbing up and down the stairs. I try to take a taxi when I can—" (Tr. 133.) Plaintiff also testified during the hearing that when he travels on public transportation, sometimes he does not know where he is. (Tr. 35.)

Plaintiff further testified that he felt afraid in the street, that he did not want anyone to see him, that he did not have any friends. (Tr. 42–43.) Plaintiff also stated that he could not cook because he forgot that he was cooking and ruined everything; that he could not do household chores because he never finished and did not put things where they belonged; and that he did not like visitors because they bother him. (Tr. 156.)

Despite the foregoing evidence in the record, the ALJ found that plaintiff was not disabled and that "none of the claimant's impairments was attended by clinical or laboratory findings, either singly or in combination, which were the same as, or medically equivalent to, the criteria for any impairment described in Appendix 1, Subpart P, Regulations No. 4." (Tr. 19.) The ALJ determined that plaintiff is classified as a younger individual, *see* 20 C.F.R. §§ 404.1563, 416.963, who is unable to communicate in English, *see* 20 C.F.R. §§ 404.1564, 416.964, with a past history of unskilled work. *See* 20 C.F.R. §§ 404.1568, 416.968. Having concluded that plaintiff retained the residual functional capacity for light work activity and applying the vocational profile set forth in the grids, the ALJ found that Rule 202.16 of 20 C.F.R.

---

also referred to as Nortriptyline, is an antidepressant medication and I think this is his major disorder at this point and I think it's a considerable problem.
Q Okay. Now, based on his testimony that this stems from the death of his son approximately two years ago and the report of the doctor regarding when treatment commenced, can you give me a rough idea about when this problem would come into play?
A My understanding of this is that the psychotherapy was not mentioned before and that this represents a relatively recent problem probably in the last couple of years but it was not apparently a documented problem nor was it one that was being treated four or five years ago.

Q Uh-huh. Now, prior to the onset of the psychiatric problem, can you give me an assessment as to what his physical residual capacity would have been?
A I would think his physical residual capacity, based on the objective data that we have is probably light level and in some instances medium level work.
Q Uh-huh. And is that based on the arthritis problem?
A The restriction why he's not able to do heavy work is because of his hypertension and his arthritis which I think is probably a very mild problem.
(Tr. 58–60.)

Pt. 404, Subpt. P, App. 2 applied to this case and that plaintiff is not disabled. The ALJ determined that plaintiff's capacity for the full range of light work has not been compromised significantly by his additional nonexertional[6] limitations. The ALJ completed the OHA Psychiatric Review Technique Form, dated October 21, 1995, finding that plaintiff had a dysthymic disorder in category 12.04, with slight restrictions of activities of daily living and slight difficulties in maintaining social functioning. The ALJ also found that the plaintiff often had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. (Tr. 21–23.)

On October 30, 1995, plaintiff requested that the Appeals Council review the decision of the ALJ, but the Appeals Council denied the request on February 13, 1996 (Tr. 6–9.),[7] and this became the final decision of the Commissioner. This civil action followed.

### DISCUSSION

■ Judicial review of the Commissioner's determination is strictly limited. A reviewing court may not decide *de novo* whether the plaintiff is entitled to benefits; rather, it must assess whether the Commissioner has applied the appropriate legal standards and whether the Commissioner's findings of fact are supported by substantial evidence. *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996); *Quinones v. Chater,* 117 F.3d 29, 33–34 (2d Cir.1997); *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987). A finding of gaps in the record or need for further development of the evidence is cause for remand. *See Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980). In the Second Circuit, "the ALJ, unlike a judge in a trial, must him [or her-]self affirmatively develop the record" in light of "the essentially nonadversarial nature of a benefits proceeding." *Echevarria v. Secretary of HHS,* 685 F.2d 751, 755 (2d Cir.1982) (citing *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir.1982); *Gold v. Secretary of Health Education & Welfare,* 463 F.2d 38,

43 (2d Cir.1972)). This duty originates from the Commissioner's regulatory responsibilities to develop a complete medical record prior to making a disability determination, 20 C.F.R. § 404.1512(d)–(f) (1997). Based on the administrative record before me, I find that the ALJ did not fulfill her duty in Batista's case in several respects. Therefore, I find that the decision to deny plaintiff's benefits is not supported by substantial evidence.

■ When the claimant appears *pro se* and suffers from ill health, as in this case, the court has "a duty to make a 'searching investigation' of the record" to be sure that the claimant's rights have been properly protected. *Gold,* 463 F.2d at 43 (quoting *Miracle v. Celebrezze,* 351 F.2d 361, 383 (6th Cir.1965)).

■ Generally to establish a disability under the Act, a plaintiff has the burden of demonstrating that he or she has a disability that will last continuously for twelve months and that the disability is supported by medical evidence, 42 U.S.C. § 423(d)(1), (3), (5) (1997). *See Parker v. Harris,* 626 F.2d 225, 230–31 (2d Cir.1980); *Gold v. Secretary of Health, Ed. and Welfare,* 463 F.2d 38, 41 n. 2 (2d Cir.1972). The Second Circuit, however, has noted on several occasions that the application of burden of proof is " 'particularly elusive in cases involving social security benefits,' in part because the proceedings 'are not designed to be adversarial' and certainly are not likely to be such when the claimant, as here, is unrepresented." *Donato v. Secretary of Department of Health & Human Services of the United States,* 721 F.2d 414, 418 (2d Cir.1983) (quoting *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir.1982)). When the claimant is unrepresented, the ALJ is directed by a heightened duty " 'to scrupulously and conscientiously probe into, inquire of, and explore all of the relevant facts,' " *Echevarria,* 685 F.2d at 755 (quoting *Hankerson,* 636 F.2d at 895); *see also Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir. 1980) (ALJ has duty to sufficiently protect a

---

6. An example of a nonexertional limitation is difficulty functioning because of nervousness, anxiety or depression. 20 C.F.R. § 404.1569a(c)(1)(i) (1997).

7. The date on the Action of Appeals Council on Request For Review is illegible; however, the Court Transcript Index records the date as February 13, 1996.

*pro se* claimant's rights "by ensuring that all of the relevant facts were developed and considered."); *cf. Cruz v. Sullivan,* 912 F.2d 8, 13 (2d Cir.1990) ("It is our conclusion that Cruz, appearing in the administrative proceeding herein as a *pro se* claimant, did not have an adequate hearing. Since counsel now represents Cruz, it is likely that the unexplored information discussed above will be pursued.")

■ Under 20 C.F.R. § 404.1512 (1997), the Commissioner has a regulatory duty to develop a complete medical record before making a disability decision, *see Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996). When determining a plaintiff's eligibility for disability, the ALJ must consider objective medical evidence as well as any testimony concerning an applicant's impairment(s), restrictions, daily activities, efforts to work, or any other relevant considerations. *See* 20 C.F.R. § 404.1512(b)(3) (1997). The ALJ also has a duty to develop psychiatric evidence where there exists some indication that the plaintiff has psychiatric problems. *Pascual v. Sullivan,* 715 F.Supp. 1268, 1271 (S.D.N.Y.1989). In the case at bar, plaintiff's psychiatric impairment is evidenced by the recommendations of Dr. Kao and Dr. Galst, the diagnosis of depression by plaintiff's treating physician, Dr. Pignaelli, the Questionnaire by Dr. Casals and the fact that plaintiff has been undergoing psychotherapy and taking Pamelor.

A claimant's "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508 (1997). Here, although the ALJ considered the Questionnaire and the Medical Assessment of Ability to Do Work–Related Activities (Mental) by Dr. Casals, the ALJ's decision and the record do not indicate that the ALJ based her decision on sufficient evidence. Dr. Casals' Questionnaire contains a brief summary of the results of plaintiff's mental status examination, which revealed that the claimant has an anxious and depressed mood, although alert and fully oriented with mild memory problems. However, the actual result of the mental status examination is not in the record. "The re-

sults of well-standardized psychological tests such as the ·Wechsler Adult Intelligence Scale (WAIS), the Minnesota Multiphasic Personality Inventory (MMPI), the Rorschach, and the Thematic Apperception Test (TAT), may be useful in establishing the existence of a mental disorder ... the process of taking a standardized test requires concentration, persistence and pace; performance on such tests may provide useful data." 20 C.F.R.Pt. 404, Subpt. P, App. 1, 12.00(D) (1997).

■ Plaintiff contends that his psychiatric history is not in the record and that the ALJ failed to develop fully plaintiff's psychiatric evidence. This Court agrees. "The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as hospitals and clinics. Adequate descriptions of functional limitations must be obtained from these or other sources which may include programs and facilities where the individual has been observed over a considerable period of time." *Id.* Further, "the existence of a medically determinable impairment of the required duration must be established by medical evidence consisting of clinical signs, symptoms and/or psychological test findings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(B) (1997). The Court must be satisfied that the ALJ's decision was based on substantial evidence. *See Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996). This Court does not find that basing the decision of plaintiff's psychiatric impairments on one questionnaire filled out by Dr. Casals constitutes substantial evidence.

The record refers to plaintiff's psychiatric condition several times. (Tr. 58–59, 165, 409, 412, 414.) Plaintiff's treating physicians, Dr. Pignaelli and Dr. Casals, both diagnosed him with psychiatric impairments. Dr. Kao indicated that plaintiff "appears to be agitated; psychiatric evaluation suggested." (Tr. 323.) Dr. Galst stated that plaintiff has "very little insight into his problems", and that plaintiff was depressed and suffered from severe anxiety. (Tr. 58.) Dr. Galst also testified that plaintiff's anxious appearance (wringing of his hands and twisting of his hat) was consistent with the report of Dr. Casals. (Tr. 59.)

Dr. Galst further mentioned that plaintiff's taking Pamelor, also known as Nortriptyline, an antidepressant, indicated that psychiatric disorder was plaintiff's major disorder at the time of the hearing. (*Id.*) Despite these apparent indications of plaintiff's mental ailment, the ALJ failed both to seek plaintiff's psychiatric medical records from his treating psychiatrist, *see* 20 C.F.R. § 404.1512(d) (Social Security Administration has responsibility to develop a claimant's complete medical history (records of medical sources) for at least the 12 months preceding the month in which a claimant files his or her application unless there is a reason to believe the development of an earlier period is necessary), or if they were unavailable or unclear, to send plaintiff out to a psychiatric consultative evaluation, *see* 20 C.F.R. §§ 404.1512(f), 416.912(f), by his own treating psychiatrist or by an independent examiner. *See* 20 C.F.R. §§ 404.1519g–i, 416.919g–i (1997). *See also* 20 C.F.R. § 404.1520a (1997) (mental status examination and psychiatric history will provide needed information to evaluate existence of mental impairment); *Gecevic v. Secretary of Health and Human Services*, 882 F.Supp. 278, 287 (E.D.N.Y.1995) (Before making a disability determination, the ALJ should obtain and examine treating psychiatrist's records regarding plaintiff's psychiatric condition).

The need for examining plaintiff's complete psychiatric history is further noted in the Commissioner's regulations concerning mental disorders:

> An individual's level of functioning may vary considerably over time. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment over time. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.

20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00(D).

■ "Incomplete medical records may not provide the substantial evidence necessary to uphold the Commissioner's decision." *Rudder v. Chater*, No. 94 Civ. 8431, 1997 WL 297009 (S.D.N.Y. June 4, 1997) (remanding the case because ALJ did not fully develop plaintiff's neurological evidence by inquiring into circumstances under which plaintiff's headaches arose, the degree of the pain from the headaches, and whether the headaches had worsened over time. Also, the ALJ did not inquire into whether any neurological examinations existed and failed to obtain a report from the neurologist or to seek the neurologist's records) (citing *Pratts v. Chater*, 94 F.3d at 38 (remanding the case because most of plaintiff's medical history was not in the record)).

■ Dr. Galst testified that plaintiff's impairment was mainly psychiatric, and thus plaintiff's residual functional capacity was less than sedentary even though he did not meet any specific listings. (Tr. 58.) The ALJ ignored Dr. Galst's statements regarding plaintiff's psychiatric condition, and instead asked the doctor: "[P]rior to the onset of the psychiatric problem, can you give me an assessment as to what his physical residual capacity would have been?" In her decision, the ALJ did not include any explanation for her omission of Dr. Galst's testimony on plaintiff's psychiatric impairment.[8] (*See* Tr. 13–20.) Administrative law judges, however, may not ignore findings of fact made by State agency medical consultants and "must explain the weight given to these opinions in their decisions." Social Security Ruling ("SSR") 96–6p, 1996 WL 374180 at *1 (S.S.A. 1996). Thus, the Court cannot allow the

---

8. The Court does not understand why the ALJ considered the residual functioning capacity question independent of plaintiff's psychiatric condition. For purposes of SSI benefits the only question is whether the combination of plaintiff's exertional and nonexertional impairments would result in disability. For purposes of disability insurance benefits, plaintiff's psychiatric condition needed to have occurred before December 31, 1994, the last date of plaintiff's insured status. The evidence in the record and Dr. Galsts' testimony demonstrate that plaintiff's psychiatric impairment started well before that date.

unexplained dismissal of the medical evidence in a claimant's favor. *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir.1983) (ALJ's denial of disability benefits was not based on substantial evidence where the ALJ did not give a reason for rejecting all of the medical evidence favoring plaintiff); *See also Gecevic*, 882 F.Supp. at 285 (ALJ owed plaintiff an explanation of why consultative psychiatrist's findings, which favored plaintiff, were being disregarded).

This Court finds that the ALJ did not have enough evidence of plaintiff's nonexertional psychiatric impairment to properly apply the Medical–Vocational Guidelines (the "grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1997), to Batista's case. "Under the Social Security Act, the Commissioner bears the burden of proof for the final determination of disability." *Pratts v. Chater*, 94 F.3d at 38. Generally, if a claimant is only afflicted with exertional impairments, e.g. strength restrictions, then the Commissioner may satisfy this burden by applying the grids mechanically. *Id.* at 38–39. If however, the claimant "suffer[ed] from additional 'nonexertional' impairments [such as anxiety or depression, 20 C.F.R. § 404.1569a(c)(1)(i) (1997) ], the grid rules may not be controlling" and "the guidelines cannot provide the exclusive framework for making a disability determination." *Id.* (quoting *Bapp v. Bowen*, 802 F.2d 601, 604–05 (2d. Cir.1986)); see also *Bapp*, 802 F.2d at 605–06 (where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate).

The ALJ determined that plaintiff is classified as a younger individual, *see* 20 C.F.R. §§ 404.1563, 416.963, who is unable to communicate in English, *see* 20 C.F.R. §§ 404.1564, 416.964, with a past history of unskilled work. *See* 20 C.F.R. §§ 404.1568, 416.968. Having concluded that plaintiff retained the residual functional capacity for light work activity and applying the vocational profile set forth in the grids, the ALJ found that Rule 202.16 applied to this case and that plaintiff is not disabled. The ALJ determined that plaintiff's capacity for the full range of light work has not been compromised significantly by his additional nonexertional limitations. However, in the record, there is not enough documentation of plaintiff's nonexertional impairment such as his psychiatric history for the ALJ to make such a determination. The ALJ acknowledged that plaintiff suffers from a dysthymic disorder which she described as a severe medical impairment. (Tr. 19.) Also, plaintiff's treating psychiatrist has characterized him as being frequently tearful, nervous, unable to concentrate, continuously depressed with limited adaptive coping skills, and increasingly sensitive to changes in his environment which increase his depression and lower his ability to concentrate. (Tr. 342.) Dr. Galst did not think plaintiff was able to do any work due to his psychiatric impairments. (Tr. 58.) The ALJ should have tried to fully develop this evidence of plaintiff's nonexertional impairment, and then determine if his nonexertional impairment so significantly diminished his work capacity that the grids would not apply in this case. *See Pratts v. Chater*, 94 F.3d at 39; *Nelson v. Bowen*, 882 F.2d at 46; *Bapp v. Bowen*, 802 F.2d at 605–06, 20 C.F.R. 404 Subpt. P, App. 2, 200.00(e)(2) (1997).

The plaintiff also notified the Social Security Administration (SSA) that he had two treating doctors, Dr. Pedro L. Benedicto and Dr. Caplan. (Tr. 123, 131.) Plaintiff indicated that he had been seeing Dr. Benedicto for chest pains until October 31, 1991, and that he had been seeing Dr. Caplan for headaches from June, 1979 to September, 1991. The record does not indicate that these doctors were asked to submit complete narrative reports or any medical records. Because these two doctors were treating plaintiff during the time of his alleged disability onset date of September 6, 1989, records and statements from these treating physicians would provide significant evidence regarding plaintiff's physical and psychiatric impairments. In plaintiff's Residual Physical Functional Capacity Assessment by Dr. Marasigan, dated January 31, 1993, the doctor indicated that there were no treating or examining source statements regarding the claimant's physical capacities in file. (Tr. 109.) Because the opinions of a treating

physician regarding a plaintiff's medical condition generally has more weight than other pertinent evidence in disability determination, *See* 20 C.F.R. § 404.1527(d) (1997); *Schisler v. Sullivan,* 3 F.3d 563 (2d Cir. 1993); *Massimino v. Shalala,* 927 F.Supp. 139, 144 (S.D.N.Y.1996), the ALJ has a duty to obtain sufficient information from a *pro se* claimant's treating physician to make his or her decision. *See Flanders v. Chater,* No. 93 Civ. 5671, 1995 WL 608287, at *7–8 (S.D.N.Y. Oct.17, 1995); *Carroll v. Secretary of Dep't of Health and Human Services,* 872 F.Supp. 1200, 1204–05 (E.D.N.Y.1995) (ALJ failed to develop record fully where *pro se* plaintiff's record did not contain documentation regarding relevant time period from treating physician, which pursuant to 20 C.F.R. § 404.1527(d) was to be given significant weight).

There was also a question as to whether plaintiff received adequate translation of the testimony of Dr. Galst. The discussion between the ALJ and the interpreter regarding the translation was as follows:

> Q   Okay. I don't want to interrupt you but I'm going to ask the interpreter, how are you—this man has to have an understanding of what the Doctor is saying in order for him to be able to pose questions later. It might, be given the length of this, it might be better for you to do a simultaneous translation for him. Are you planning on doing a summary or what were you—
>
> INT: Oh.
>
> ALJ:—planning on doing?
>
> INT: I didn't know you wanted me to do that. Okay. The only thing is that I'm not familiar with some of these, you know, medical terms. If he could just paraphrase them for me sort of then no problem, you know.
>
> ALJ: Okay. So you don't feel that you're able to summarize what's already taken place?
>
> INT: Well, a little bit, yeah.

(Tr. 51–52.)

Based on the exchange above, this Court is not certain that plaintiff received proper translation of the testimony of Dr. Galst.

When plaintiff was asked if he had any additional questions after Dr. Galst's testimony, he said no. It is not clear to the Court that plaintiff failed to ask questions because he had none or because he did not understand what Dr. Galst was saying.

The ALJ acknowledged that plaintiff suffers from several severe medically determinable impairments: arthritis of the cervical and thoracic spines, hypertension, and a dysthymic disorder, (Tr. 19.) but rejected his complaints because of a lack of objective evidence. (Tr. 16.) SSR 96–7p holds that an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence. SSR 96–7p, 1996 WL 374186, at *6 (S.S.A. July 2, 1996).

█   In assessing a claimant's credibility concerning his ability to work, an ALJ must consider all of the evidence in the record. *Id.* at *5. This includes, but is not limited to:

* The medical signs and laboratory findings;

* Diagnosis, prognosis and other medical opinions provided by treating or examining physicians or psychologists and other medical sources;

* Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

*Id.*

· A strong sign of the credibility of a claimant's statements is their consistency, "both internally and with other information in the case record." *Id.* The ALJ must consider such factors as:

* The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

* The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources . . .

* The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

*Id.* at *5–6.

■ "It is the function of the [Commissioner], not [the courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Secretary of Health and Human Services,* 705 F.2d 638, 642 (2d Cir.1983). However, the ALJ failed to address the consistency of plaintiff's statements with the rest of the evidence in the record in rejecting the plaintiff's complaints and upon remand, this evidence should also be considered.

### CONCLUSION

I find that the ALJ failed to assist the *pro se* plaintiff in developing his psychiatric record. Also, I find that the ALJ did not develop sufficient evidence of plaintiff's nonexertional psychiatric impairment(s) to properly evaluate plaintiff's residual functional capacity and accurately apply the Medical Vocational Guidelines to this case. Thus, I do not find that the Commissioner's decision was based on substantial evidence, and this case is **REMANDED** to the Commissioner for reconsideration in accordance with this Opinion and Order.

**SO ORDERED.**